<u>April Ademiluyi v. Maryland State Board of Elections; Administrator State Board of Elections, Linda Lamone; State Governor, Lawrence Hogan; Judge Ingrid Turner</u>, No. 35, September Term, 2017

**ELECTION LAW – MD. CODE ANN., ELEC. LAW (2002, 2010 REPL. VOL.) § 12-202 – CHALLENGE TO JUDICIAL CANDIDATE'S ELIGIBILITY – STATUTE OF LIMITATIONS – DOCTRINE OF LACHES – UNREASONABLE DELAY – PREJUDICE –** Court of Appeals held that trial court correctly granted appellees' motion to dismiss on grounds that appellant's petition raising election claims as to judge's eligibility for judicial office was untimely under Md. Code Ann., Elec. Law (2002, 2010 Repl. Vol.) ("EL") § 12-202(b)'s statute of limitations, and barred by doctrine of laches. Court concluded that petition was untimely filed under EL § 12-202(b) because appellant did not file petition in trial court until May 9, 2017, more than six months after 2016 general election, and more than one year after appellant admittedly became aware of facts that served as basis for election claims; and petition was filed at least several months after election results were certified. Court determined that there was no basis on which to toll statute of limitations. Additionally, independent of statutory limitations period of EL § 12-202(b), Court held that petition was barred by doctrine of laches because, in filing petition in trial court more than six months after 2016 general election, appellant unreasonably delayed in assertion of rights, and delay prejudiced appellees.

Circuit Court for Anne Arundel County
Case No. C-02-CV-17-001383

Argued: January 9, 2018

IN THE COURT OF APPEALS

OF MARYLAND

No. 35

September Term, 2017

_____

APRIL ADEMILUYI

v.

MARYLAND STATE BOARD OF
ELECTIONS; ADMINISTRATOR STATE
BOARD OF ELECTIONS, LINDA LAMONE;
STATE GOVERNOR, LAWRENCE HOGAN;
JUDGE INGRID TURNER

_____

Barbera, C.J.
Greene
Adkins
Watts
Hotten
Getty
Battaglia, Lynne A. (Senior
Judge, Specially Assigned),

JJ.

_____

Opinion by Watts, J.

_____

Filed: March 26, 2018

Pursuant to Md. Code Ann., Elec. Law (2002, 2010 Repl. Vol.) ("EL") § 12-202(a), where "no other timely and adequate remedy is provided by" the Election Law Article, a registered voter may bring an action with respect to "any act or omission relating to an election" that is "(1) inconsistent with [the Election Law A]rticle or other law applicable to the elections process[] and (2) may change or has changed the outcome of the election." (Paragraph break omitted). This Court has explained that EL § 12-202 "governs judicial challenges to certain irregularities in relation to an election[,]" and that, in particular, EL § 12-202 "is the mechanism for challenging the qualifications of a candidate seeking election." Lamone v. Schlakman, 451 Md. 468, 482, 153 A.3d 144, 152 (2017) (cleaned up).

EL § 12-202(b) sets forth strict deadlines for filing such an action, providing:

A registered voter may seek judicial relief under this section in the appropriate circuit court within the earlier of:

(1) 10 days after the act or omission or the date the act or omission became known to the petitioner; or

(2) 7 days after the election results are certified, unless the election was a gubernatorial primary or special primary election, in which case 3 days after the elections results are certified.

This Court has described EL § 12-202(b) as providing "a statutory limitations period[.]" Schlakman, 451 Md. at 485, 153 A.3d at 154. A registered voter who fails to file an action within the statutory limitations period risks having his or her judicial challenge dismissed as untimely. Importantly, "the very short time limits for filing a suit challenging an aspect of an election pursuant to EL § 12-202(b) are evidence of this State's public policy that claims for judicial relief relative to an election must be prosecuted without delay." Baker

v. O'Malley, 217 Md. App. 288, 296, 92 A.3d 588, 593, cert. denied, 440 Md. 115, 99 A.3d 779 (2014).

Given the clear mandate for prompt action in election cases, independent of EL § 12-202(b)'s statutory limitations period for challenging any act or omission relating to an election, a registered voter's action may be barred by the doctrine of laches. "The doctrine of laches, which is both an affirmative defense and an equitable defense, applies where there is an unreasonable delay in the assertion of one party's rights and that delay results in prejudice to the opposing party." Jones v. State, 445 Md. 324, 339, 126 A.3d 1162, 1171 (2015) (cleaned up). The doctrine of laches has been invoked to bar a registered voter's election claims "where the delay in seeking judicial relief was measured in days[.]" Baker, 217 Md. App. at 296, 92 A.3d at 593. Indeed, even an action that is arguably filed within the statutory limitations period of EL § 12-202(b)—i.e., before the election results are certified, and within ten days after the registered voter has knowledge of the challenged act or omission—may nevertheless be barred by the doctrine of laches. See generally Ross v. State Bd. of Elections, 387 Md. 649, 668 & n.8, 672-73, 876 A.2d 692, 703 & n.8, 705-06 (2005).

In this case, on May 9, 2017, more than six months after the 2016 general election, April Ademiluyi ("Appellant"), an unsuccessful candidate for the position of judge of the Circuit Court for Prince George's County, filed a petition in the Circuit Court for Anne Arundel County ("the circuit court") seeking to have the candidacy of the successful

candidate, the Honorable Ingrid M. Turner ("Judge Turner"),[1] decertified. Appellant alleged that Judge Turner had never practiced law in Maryland, and was, therefore, constitutionally unqualified for judicial office. Appellant named as defendants the Maryland State Board of Elections, State Administrator of Elections Linda Lamone, Governor Lawrence J. Hogan, Jr., and Judge Turner (together, "Appellees"). In the petition, Appellant sought a writ of mandamus ordering the Governor to rescind the commission that he had issued[2] to Judge Turner, and an order decertifying both Judge Turner's candidacy and the election results. On May 22, 2017, Appellant filed an amended petition, raising the same allegations and seeking the same relief. Before any response from Appellees, Appellant filed a motion for summary judgment and a memorandum of law, contending that she was entitled to the position of judge of the Circuit Court for Prince George's County.

Thereafter, Appellees filed a motion to dismiss, or, in the alternative, a cross-motion for summary judgment, arguing, in relevant part, that the election claims were untimely under EL §12-202(b) and barred by the doctrine of laches. On September 8, 2017, the

---

[1]Although some of the relevant events in this case occurred before Judge Turner assumed the office of judge, we refer to her as "Judge Turner."

[2]Generally speaking, a "commission" is "[a] warrant or authority, from the government or a court, that empowers the person named to execute official acts[.]" *Commission*, Black's Law Dictionary (10th ed. 2014). Art. IV, § 11 of the Constitution of Maryland, concerning certification of judicial election results, provides, in pertinent part, that "[t]he election for Judges . . . shall be certified, and the returns made . . . to the Governor, who shall issue commissions to the different persons for the offices to which they shall have been, respectively, elected[.]" Thus, in Maryland, the Governor issues a commission to an individual who is elected to the position of judge, which empowers that individual to serve as a judge.
(Continued...)

circuit court conducted a hearing, and granted the motion to dismiss. The circuit court ruled, in pertinent part, that the petition was untimely filed under EL § 12-202(b), and that the doctrine of laches barred the election claims. On the same day, Appellant filed a notice of appeal to this Court pursuant to EL § 12-203.[3] On September 12, 2017, consistent with its oral ruling, the circuit court issued an order granting the motion to dismiss.

In this direct appeal, we consider whether the circuit court properly granted the motion to dismiss on the grounds that the petition was untimely filed under EL § 12-202(b) and barred by the doctrine of laches. We hold that the circuit court was correct on both counts. The petition was untimely filed under EL § 12-202(b) because Appellant did not file the petition in the circuit court until May 9, 2017, more than six months after the 2016 general election, and more than one year after Appellant admittedly became aware of the facts that served as the basis for the election claims and at least several months after the election results were certified. And, we determine that there is no basis on which to toll the statute of limitations. Additionally, independent of the statutory limitations period set forth in EL § 12-202(b), the petition is barred by the doctrine of laches because, in filing the petition in the circuit court more than six months after the 2016 general election, Appellant unreasonably delayed in asserting her rights, and that delay prejudiced Appellees. Accordingly, we affirm the judgment of the circuit court. Because we hold that

---

[3]EL § 12-203(a)(3) provides that an appeal in a proceeding involving an election claim "shall be taken directly to the Court of Appeals within 5 days of the date of the decision of the circuit court." And EL § 12-203(b) provides that "[t]he Court of Appeals shall give priority to hear and decide an appeal brought under subsection (a)(3) of this section as expeditiously as the circumstances require."
(Continued...)

the circuit court correctly granted the motion to dismiss, we need not address the three

other questions presented on brief by Appellant that concern the merits of the election

claims.[4]

---

[4]Specifically, Appellant raises the following three issues concerning the merits:

2.        Whether [Judge Turner], in this case, committed the crime of misconduct while in office or violated public ethics laws through using the Attorney General to defend a judicial challenge to her constitutional qualifications to appear on the election ballot and campaign misconduct[.]

3.        Whether a member of the Maryland bar, whose only experience with the practice of law is military law as an active member of the U.S. Navy[,] meets the qualifications of Art. IV §[ ]2 of the Maryland Constitution to serve as a Circuit Court Judge[.]

4.        Upon an attorney candidate's disqualification after winning a judicial election, whether Art. IV §[ ]5 grants the commission to a qualified candidate[,] who also ran in the judicial election[.]

In any event, with respect to the third question presented, to the extent that Appellant raises a claim that Judge Turner has never practiced law in Maryland and is, therefore, not eligible for judicial office, she is mistaken. Art. IV, § 2 of the Constitution of Maryland provides that judges in this State "shall be not less than thirty years of age at the time of their election or appointment, and shall be selected from those who have been admitted to practice Law in this State, and who are most distinguished for integrity, wisdom and sound legal knowledge." The plain language of Art. IV, § 2 requires simply that a judicial candidate be "admitted to practice Law in this State[,]" which means that a judicial candidate must be a member of the Bar of Maryland. See, e.g., Bernstein v. State, 422 Md. 36, 45 & n.2, 29 A.3d 267, 272 & n.2 (2011) (This Court noted that Art. IV, § 2's clause requiring that a judicial candidate be "admitted to practice Law in this State" "is commonly read to require that certain judicial offices be filled by current members of the Maryland Bar[,]" and that "it is well established[] that having been admitted to practice law in this State is a requirement for selection as a judge[.]"). In other words, this Court has interpreted the plain language of Art. IV, § 2 to require only that a judicial candidate be "admitted to practice Law in this State[,]" i.e., be a member of the Bar of Maryland. In this case, it is undisputed that Judge Turner is a current member of the Bar of Maryland, having been admitted in 1994. Thus, Judge Turner clearly satisfies Art. IV, § 2's requirement that a judicial candidate be "admitted to practice Law in this State[.]"
(Continued...)

## BACKGROUND

### 2016 General Election and Judicial Disabilities Complaint

In 2016, Appellant was a candidate for judge of the Circuit Court for Prince George's County in the primary and general elections. In the general election, the candidates included three incumbent judges of the Circuit Court for Prince George's County,[5] as well as two lawyers, Appellant and Judge Turner. On November 8, 2016, in the general election, Judge Turner and the three incumbent judges received sufficient votes to win the election; Appellant finished last. After the election results were certified, Governor Hogan issued commissions to the successful candidates, including Judge Turner, who subsequently took the oath that is prescribed by the Constitution of Maryland, and assumed the office of judge of the Circuit Court for Prince George's County.

Now, we briefly describe events that occurred before the 2016 general election. On April 14, 2016, before both the 2016 primary election on April 26, 2016, and the general election, Appellant filed with the Commission on Judicial Disabilities ("the Commission") a complaint against Judge Turner, alleging that Judge Turner had committed various ethical violations during the election campaign by engaging in prohibited political activities, including endorsing numerous politicians.[6] In the ethics complaint, Appellant alleged that

---

[5]The incumbent judges were the Honorable Herman C. Dawson, the Honorable Dorothy Michelle Engel, and the Honorable Karen Holliday Mason.

[6]The Commission is empowered to, among other things, "[i]nvestigate complaints against any judge of" any Maryland court. Md. Const., Art. IV, § 4B(a)(1)(i). A judge commits "sanctionable conduct" where the judge engages in "misconduct while in office, the persistent failure by a judge to perform the duties of the judge's office, or conduct (Continued...)

- 6 -

Judge Turner had made a quid pro quo agreement with Maryland Delegate Joseline Peña-Melnyk that Judge Turner would drop out of a congressional race in which Judge Turner had initially been a candidate, run for judge of the Circuit Court for Prince George's County, and endorse Delegate Peña-Melnyk for the congressional seat; and, in turn, Delegate Peña-Melnyk would endorse Judge Turner for the judgeship.[7]

prejudicial to the proper administration of justice[,]" or where the judge violates "any of the provisions of the Maryland Code of Judicial Conduct[.]" Md. R. 18-401(j)(1).

By contrast, a candidate for judicial office who is an attorney "shall comply with Rule 19-308.2 of the Maryland Attorneys' Rules of Professional Conduct [("MARPC")]." Md. R. 18-104.6(a). In turn, MARPC 8.2(a), *i.e.*, Maryland Rule 19-308.2(a), provides, in relevant part, that "[a]n attorney shall not make a statement that the attorney knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of . . . a candidate for election or appointment to judicial legal office." And, MARPC 8.2(b)(3) provides that an attorney who becomes a candidate for judicial office "shall not knowingly misrepresent his or her identity or qualifications[.]"

Nevertheless, Maryland Rule 18-104.6(b) provides: "A successful candidate and a judge who unsuccessfully sought a different judicial office are subject to judicial discipline for campaign conduct. An unsuccessful candidate who is an attorney is subject to attorney discipline for campaign conduct." In other words, whether a judge or an attorney, a candidate for judicial office may be subject to discipline for campaign conduct. Which entity has jurisdiction over alleged campaign misconduct, however, depends on whether the individual is a judge or an attorney—if the individual is a judge, then the Commission has jurisdiction, whereas, if the individual is an attorney, then the Attorney Grievance Commission has jurisdiction.

[7]On December 6, 2017, Appellees filed in this Court a "Motion to Seal Proceedings," requesting that this "Court enter an order sealing the proceedings in this Court and in the [c]ircuit [c]ourt[.]" Appellees contended that the proceedings in the case involved the filing of the ethics complaint with the Commission against Judge Turner, a successful candidate for judicial office, and the resolution of the ethics complaint before the filing of any formal charges. Appellees argued that proceedings before the Commission are confidential, and that, because Appellant relied on, and included in her filings, matters pertaining to the ethics complaint, the proceedings in this Court and the circuit court should be sealed. On December 10, 2017, Appellant filed an opposition to the motion to seal. On December 15, 2017, this Court issued an order deferring action on the motion to seal pending oral argument. On January 8, 2018, one day before oral argument in this case, Appellees filed a letter advising that the motion to seal was withdrawn. As such, we do not consider the matter further.

While the ethics complaint was pending before the Commission, on April 21, 2016, a few days before the 2016 primary election, The Washington Post published an article, which included, in relevant part, the following information about Judge Turner:

> The other challenger is veteran politician [] Turner, who dropped out of a crowded congressional race to compete for a judgeship, hoping to capitalize on her experience as a military lawyer and former member of the [Prince George's C]ounty [C]ouncil.
>
> * * *
>
> Turner, a former Prince George's County Council member, wants to reform the judicial system. "We need an eye toward rehabilitation and becoming more of a problem-solving court," she said.
>
> Turner, 52, was running for Congress when she learned about the court opening. The retired military attorney quickly changed gears.
>
> For 20 years, the [United States] Naval Academy graduate served as legal counsel to admirals, administrative units[,] and sailors. But she has little experience in local courts. She returned to Prince George's [County] after her 2006 retirement[,] and was elected to two terms on the [C]ounty [C]ouncil.
>
> Turner's detractors say [that] the politician is simply seeking secure employment — the job pays about $154,000 a year — after she was term-limited and dropped out of the congressional race.
>
> But Turner says she is running to educate voters that they have a choice when it comes to the judicial system.
>
> "In 1986, they didn't want women at the [United States Naval A]cademy. Let alone a black woman," she said. "When I ran in 2006 for [Prince George's] County Council, they said I wouldn't win because I wasn't in the politician pipeline. But the community rallied around me[,] and told me I belonged."

Arelis R. Hernández, *A rare challenge in Maryland judge's race*, Wash. Post, Apr. 21, 2016, underline available at https://www.washingtonpost.com/local/md-politics/a-rare-challenge-in-

- 8 -

maryland-judges-race/2016/04/21/65468dfe-f513-11e5-9804-537defcc3cf6_story.html? utm_term=.feb4d1c8449f [https://perma.cc/5BGG-UA98].[8]  In an affidavit that was later filed in the circuit court, Appellant averred that she "had no knowledge of [Judge] Turner's legal practice history until [T]he Washington Post['s] article[] dated April 21, 2016 had been published[,] and [the Commission] was invest[igat]ing [Judge] Turner."  (Record citation omitted).

Over a year later, after the 2016 primary and general elections, the Commission responded to Appellant's ethics complaint against Judge Turner, who had assumed office. Specifically, in a letter dated April 26, 2017, the Commission stated that the ethics complaint against Judge Turner had been "reviewed and discussed by the Judicial Inquiry Board" and the Commission, and,

> after the full and complete review of the materials and discussion by the Board and Commission, the Commission concluded that the evidence failed to show that Judge Turner committed sanctionable conduct, as defined [by] Maryland Rule 18-401([j]).  As a result, the Commission dismissed the complaint, as required by Maryland Rule 18-406(a)(1).

**Proceedings in the Circuit Court**

On May 9, 2017, almost two weeks after the date of the Commission's letter, and

---

[8]According to Judge Turner's official biography from the Maryland Manual On-Line, attached as an exhibit to Appellant's motion for summary judgment, in 1986, Judge Turner graduated from the United States Naval Academy, and, in 1994, Judge Turner was admitted to the Bar of Maryland.  According to another exhibit, Judge Turner's biography on princegeorgescourts.org, Judge Turner served as a judge advocate in the United States Navy Judge Advocate General's Corps, achieving the rank of Commander before retiring. And, in a motion to dismiss filed in the circuit court, Appellees stated that Judge Turner "served as Deputy Legal Counsel at the National Naval Medical Center, in Bethesda, Maryland, from 2001 to 2004."

more than six months after the 2016 general election, Appellant filed in the circuit court a "Petition for Writ of Mandamus and Complaint for Declaratory and Injunctive Relief" against Appellees, contending that Judge Turner was constitutionally unqualified for office because she allegedly had never practiced law in Maryland. Appellant requested that the circuit court issue a writ of mandamus ordering Governor Hogan to rescind Judge Turner's commission, as well as an order decertifying both Judge Turner's candidacy and the election results. In the petition, Appellant alleged that Judge Turner, as a military lawyer, had not practiced law in Maryland, and, accordingly, was not qualified to be a Maryland judge. In the petition, Appellant also contended that there was no prejudice or unreasonable delay in the timing of the filing of the petition. On May 22, 2017, Appellant filed an amended petition, raising the same allegations and seeking the same relief.

Before any response by Appellees to the petition or the amended petition, on July 9, 2017, Appellant filed a motion for summary judgment and a memorandum of law. In the memorandum, Appellant contended that Judge Turner was constitutionally unqualified to be a judge in Maryland because she allegedly had not practiced law in Maryland, and argued that she (Appellant) was entitled to the commission for judgeship in the Circuit Court for Prince George's County. Appellant asserted that the statute of limitations, EL § 12-202(b), was inapplicable, or, in the alternative, must be tolled. Appellant maintained that Judge Turner had committed fraud upon Maryland taxpayers to secure her salary as a judge, and that such fraud warranted tolling the statute of limitations. According to Appellant, she "was entirely justified in pursuing and awaiting disposition of her claims with [the Commission] because [Judge] Turner's lack of qualifications and prohibited

- 10 -

political activity during the 2016 election cycle [were] so prejudicial to the administration of justice that it could have resulted in [Judge Turner's] removal." In the memorandum, Appellant contended that the doctrine of laches did not apply because there was neither prejudice nor inexcusable delay.

In an "Affidavit in Support of Motion for Summary Judgment," Appellant averred, in relevant part, as follows:

> [] I had no knowledge of [Judge] Turner's legal practice history until [T]he Washington Post['s] article[] dated April 21, 2016 had been published[,] and [the Commission] was invest[igat]ing [Judge] Turner.
>
> * * *
>
> [] On April 29, 2017, I received notice from the [Commission] that my complaint against [Judge] Turner went through the full process[,] but the [Commission] decided not to take action.
>
> [] After receiving notice of disposition from [the Commission], I immediately verified [Judge] Turner's online official Maryland biographies and commenced this suit[.]

(Record citations omitted).

On July 21, 2017, Appellees filed a "Motion to Dismiss or, in the Alternative, Cross-Motion for Summary Judgment and Opposition to [Appellant]'s Motion for Summary Judgment," contending that the election claims were barred in their "entirety by limitations and [the doctrine of] laches," and, that the claims, "as a matter of law," lacked merit. Appellees requested that the circuit court dismiss the amended petition, or, in the alternative, issue a declaratory judgment in their favor. In the motion to dismiss, in relevant part, Appellees argued that Appellant's claims, in which she challenged Judge Turner's qualifications as a candidate for judge of the Circuit Court for Prince George's County,

were election claims that were not filed within the statutory limitations period that was prescribed by EL § 12-202(b), and, as such, were barred.

Appellees pointed out that Appellant waited to bring the election claims until more than a year after the 2016 primary election, and more than six months after the 2016 general election, which, "on its face," demonstrated that the claims were untimely under EL § 12-202(b). Appellees also asserted that, in the affidavit in support of the motion for summary judgment, Appellant acknowledged seeing The Washington Post's article in April 2016, and, accordingly, Appellant "admittedly had knowledge of the alleged deficiency in qualifications by April 2016[.]" Appellees contended that filing the ethics complaint with the Commission concerning a judicial candidate's campaign conduct did not toll EL § 12-202(b) with respect to an election claim concerning a judicial candidate's qualifications. Appellees asserted that Appellant failed to demonstrate any ground on which to toll the statute of limitations because Appellant had not alleged "that she was somehow tricked or deceived into missing the deadline[, or] that the failure to meet the deadline was beyond her control."

Appellees also contended that the election claims were barred by the doctrine of laches, and that claims challenging the qualifications of a judicial candidate must be promptly brought so that such claims can be resolved prior to an election. Appellees argued that the delay in bringing the election claims—more than six months after the general election—was inexcusable, and that the delay prejudiced Judge Turner, the State Board of Elections, the voters of Prince George's County, and the circuit court. Appellees asserted that, if Appellant were successful in bringing the election claims, and Judge Turner were

disqualified and removed, voters who had voted for Judge Turner would be prejudiced by having their votes invalidated.

On July 23, 2017, Appellant filed an opposition to the motion to dismiss, requesting that the circuit court grant summary judgment in her favor, declare the commission that Governor Hogan issued to Judge Turner to be void, and order Governor Hogan to issue the commission for judgeship in the Circuit Court for Prince George's County to Appellant.

On September 8, 2017, the circuit court conducted a hearing on the motion for summary judgment and the motion to dismiss. During the hearing, as to The Washington Post's article, Appellant argued as follows:

> I reported to [the] Commission[,] and[,] as soon as I reported my complaint[, it] started investigating. But it was maybe a few days before the primary [election] that [The] Washington Post['s] article came out[,] outlining everyone's qualifications and criticizing [Judge] Turner for her motives [in] switching from the congressional race to the judge race[,] and also criticizing her qualifications.
>
> She has never practiced law. That is actually when I found out that she has never practiced law. And [I] actually started researching her bio[graphie]s on[]line, asking some people. No, she has never practiced law in this State.
>
> But[,] at that time[,] I already had the ethics complaint pending.

When asked by the circuit court why she did not file a complaint in the circuit court concerning Judge Turner's alleged lack of qualifications, in addition to the ethics complaint filed with the Commission, Appellant responded:

> Well, I thought [that] it was best for the [] Commission to handle it. I mean, you know, as I said[,] it was [Judge Turner's] lack of qualifications on top of the rules that she had breached, I thought bolster[ed] the ethics complaint. It made it more appropriate for the [] Commission to investigate and to take action than myself. It made more sense to me to wait for [the Commission]

- 13 -

to do what the[] Constitution specially created [it] to do.  So, I thought [that] it made sense to allow the [] Commission to act first.

Appellant acknowledged that she "could have" pursued both actions simultaneously, but maintained that, "[i]f [she had] filed an ethics complaint against [Judge Turner,] and [Judge Turner] could have been disqualified at any point in time by the [] Commission, [Judge Turner] was on notice that that could have happened."

After hearing argument from the parties on the motion to dismiss, the circuit court orally granted the motion to dismiss, explaining that the petition was untimely filed under EL § 12-202(b) and that the doctrine of laches barred the election claims:

> And[,] in this case[,] I can't get around the fact that[,] while you filed the ethics complaint . . . with [the Commission,] the Election Law Article clearly provided that you had to file within 10 days after the act or omission[,] or within seven days after the election results were certified.
>
> And[,] even in the light most favorable to [Appellant], in the complaint, [she stated that she] didn't do it until six months later.
>
> The question becomes [whether] equitable tolling [would] apply.  And I have not seen a case or a statute [that] would allow the [c]ourt to reach the equitable tolling argument.
>
> There is nothing to indicate in the pleadings that [Appellant was] misled.  There is nothing to indicate that there was [an] inability to file.  And there is nothing that I have read in the complaint [that] would indicate that there [were] some unavoidable circumstances.
>
> And[,] as I read the election cases, it certainly seems to the [c]ourt that [the doctrine of] laches may come into play because[,] were I to vacate the seat, then I would be overturning an election, depriving the citizens of who[m] they voted for, depriving [Judge] Turner of her seat in the Circuit Court [for Prince George's County] and depriving the Circuit Court [for Prince George's County] of a judge.

* * *

- 14 -

> . . . I feel compelled to grant the [m]otion to [d]ismiss for failure to state a claim upon which relief can be granted even in the light most favorable reading of the complaint because of the clear language of [EL §] 12-202[,] and there not being a timely challenge[,] and no facts within the complaint to indicate [that] equitable tolling would be appropriate. And the [c]ourt would also find that [the doctrine of] laches applies.

The circuit court stated that the order granting the motion to dismiss would specify that the motion to dismiss was being granted "for failure to state a claim because[,] under the [s]tatute of [l]imitations[,] the [c]ourt finds that [EL §] 12-202[(b)] applies. And equitable tolling does not apply. . . . And [the doctrine of] laches applies." According to the circuit court, it did not need to address the motion for summary judgment, but, were it to rule on the motion for summary judgment, there were no disputed facts, and it "would have granted [s]ummary [j]udgment for [Appellees,] and not for [Appellant]."[9]

On the same day as the hearing, September 8, 2017, Appellant filed a notice of appeal directly to this Court pursuant to EL § 12-203.

On September 12, 2017, consistent with its oral ruling, the circuit court issued an order granting the motion to dismiss that stated, in pertinent part, as follows:

> [The circuit court has] determined that (a) [Appellant] failed to avail herself within the applicable time limits of her statutory remedy under [EL]

---

[9]As to the merits of the election claims, the circuit court stated that, were it to reach the constitutional challenge, "it seem[ed] clear to the [c]ourt that the Constitution simply requires [a candidate for judgeship] to be admitted to practice law[, and] there is no requirement that [a candidate for judgeship] actually practice law." The circuit court further explained that it would issue a declaratory judgment declaring that Judge Turner was "a qualified candidate under [] Art[.] IV, [§] 2 [of the Constitution of Maryland,] and also that there is a remedy provided by [EL §] 12-202." In other words, as the circuit court stated, because there was a remedy available under EL § 12-202, mandamus relief was not available, and "there [was] a failure to state a claim [for] relief [in the form of] mandamus[,] as there [was] no clear legal right to the office under [] Art[.] IV, [§] 5 [of the Constitution of Maryland]." (Italics omitted).

- 15 -

§ 12-202 . . . ; (b) equitable tolling does not apply; (c) [Appellant]'s claims[,] brought months after the election[,] are barred by [the doctrine of] laches[;] and (d) [Appellant] has failed to state a claim for mandamus relief[.]

## MOTION TO DISQUALIFY

On November 27, 2017, in this Court, Appellant filed a "Motion to Disqualify Counsel and Other Relief," requesting that "this Court [] disqualify the Attorney General's representation of [Judge] Turner, and hold [Judge] Turner in default, and if that relief [were] granted," Appellant further "move[d], pursuant to [Maryland] Rule 8-523(a)(2),[10] to dispose of the case without oral argument[.]"  In the motion to disqualify, Appellant contends that the Attorney General was prohibited by statute from representing Judge Turner "because this case does not involve [Judge] Turner acting in her official duties[.]"  Appellant argues that there is a conflict of interest in having the Attorney General represent Judge Turner where Appellant has alleged that Judge Turner "violat[ed] the laws and Constitution[.]"  Specifically, Appellant asserts:

> If [Judge] Turner is not qualified, then the State has an interest in removing her from the bench[,] but the Attorney General is fighting to avoid that outcome.  It[ is] highly unethical for the Attorney General to spend tax[]pay[e]r dollars to assist one candidate over the other to win a judicial election.

(Citation omitted).  Thus, according to Appellant, the Attorney General should be disqualified from representing Judge Turner, and Judge Turner should be held in default.

On November 28, 2017, Appellees filed an opposition to the motion to disqualify,

---

[10]Maryland Rule 8-523(a)(2) provides: "In the Court of Appeals a party may not submit an appeal for consideration on brief except with permission of the Court.  A request to submit on brief shall be made in writing at least 15 days before argument."

contending that the motion to disqualify should be denied for three reasons. First, Appellees correctly point out that Appellant failed to raise any issue concerning disqualification of the Attorney General until on appeal in this Court, and Appellees argue that, accordingly, the motion is untimely, and any issue of disqualification has been waived. Second, Appellees assert that, even if this Court were to consider the merits, the motion to disqualify fails to identify any violation or potential violation of the Maryland Attorneys' Rules of Professional Conduct by the Office of the Attorney General or its attorneys. Appellees maintain that the Attorney General's representation of Judge Turner is appropriate because Judge Turner is a duly elected and sworn State official, and, when the Office of the Attorney General began representing Judge Turner, neither Appellant nor Judge Turner was a candidate for judicial office, as the election was over, and the results certified. Finally, Appellees contend that the concept of "default" has no application here, that granting the motion to disqualify would merely permit Judge Turner to obtain other counsel, and that the Attorney General would continue representing the State officers and State Board of Election.

On November 29, 2017, Appellant filed a reply to the opposition to the motion to disqualify, contending that: (1) the Attorney General has engaged in an "unethical pursuit" favoring Judge Turner over Appellant for the position of judge of the Circuit Court for Prince George's County; (2) there is a conflict of interest that cannot be waived; and (3) Judge Turner may be held in default on appeal, and, if held in default, Judge Turner is not entitled to additional time to seek new counsel.

On the same day, November 29, 2017, this Court issued an order deferring action

on the motion to disqualify pending oral argument.[11]  We now address the motion to disqualify, and deny the motion.

It is undisputed that, until the filing of the motion to disqualify in this Court, Appellant had not raised, either in the circuit court or this Court, any issue as to disqualification of the Office of the Attorney General in representing Judge Turner.  This circumstance raises an issue of waiver.  In Balt. Cty. v. Barnhart, 201 Md. App. 682, 684-85, 712-13, 30 A.3d 291, 293, 309 (2011), where a former Baltimore County Attorney had represented a former Baltimore County employee in an administrative appeal of Baltimore County's calculation of the former employee's retirement benefits, the Court of Special Appeals discussed waiver of the ability to request an attorney's disqualification, stating:

> When determining whether a party has waived its right to move to disqualify counsel, the Court must examine whether the party filed its motion in a timely manner.  Timely service of a motion to disqualify helps to curb the potential use of the motion as a litigation tactic or to harass the opposing party.  Courts analyze a number of factors when considering whether the motion was timely made, including:
>
> > when the movant learned of the conflict; whether the movant was represented by counsel during the delay; why the delay occurred, and, in particular, whether the motion was delayed for tactical reasons; and whether disqualification would result in prejudice to the nonmoving party.

(Cleaned up).

---

[11]On January 9, 2018, at the start of oral argument in this case, Appellant mentioned that the motion to disqualify was pending.  Later during oral argument, Appellant contended that, by statute, the Attorney General is permitted to represent a State official only in cases related to "the State's legal business[,]" and, according to Appellant, running for public office and having a name placed on an election ballot "is a personal matter[,]" and not the State's legal business.

Although this case arises in a different context, the factors that were discussed by the Court of Special Appeals in <u>Barnhart</u> with respect to waiver of the ability to request disqualification of an attorney apply with equal force here. Applying those factors, we conclude that Appellant has waived any right to move for disqualification of the Attorney General. As to the first factor—when Appellant learned of the alleged conflict—on June 26, 2017, after Appellees were served with Appellant's petition, an Assistant Attorney General filed in the circuit court a consent motion to extend the time for Appellees to file a response to the petition. In the consent motion, the Assistant Attorney General stated that service on Judge Turner was ineffective because it was not made by serving the Attorney General. It would have been readily apparent from the consent motion that the Attorney General was representing Judge Turner. Yet, Appellant never filed in the circuit court a motion to disqualify. Indeed, it was not until November 27, 2017, over five months after being made aware that the Attorney General was representing Judge Turner, that Appellant filed in this Court the motion to disqualify.

As to the second factor—whether Appellant was represented by counsel during the delay—although Appellant represents herself, Appellant is an attorney who, according to the amended petition, has been both licensed to practice law in Maryland, and has owned and operated a solo practice, for approximately nine years at the time of the filing. As to the third factor—why the delay occurred, and whether the motion to disqualify was delayed for tactical reasons—Appellant fails to provide any explanation in either the motion to disqualify or the reply as to why she waited over five months to file a motion to disqualify, or why she did not move to disqualify the Attorney General in the circuit court.

Finally, as to the fourth factor—whether disqualification would prejudice Judge Turner, the nonmoving party—obviously, had the Attorney General been disqualified from representing Judge Turner before the completion of briefing and oral argument in this Court, Judge Turner would have been prejudiced, as Judge Turner would have needed to either seek new counsel or represent herself. Plainly, consideration of the above factors leads to the conclusion that, through Appellant's inaction, despite knowing of the Attorney General's representation of Judge Turner as early as June 2017, Appellant has waived the right to request the Attorney General's disqualification. The motion to disqualify is denied.[12]

**DISCUSSION**

Having denied the motion to disqualify, we now address the dismissal of Appellant's petition on the grounds that the petition was untimely filed under EL § 12-

---

[12]In any event, as to the merits of the motion, we note that, when the petition was filed in the circuit court, Judge Turner was an elected and sworn State official, see, e.g., Md. Const., Art. IV, § 3 (The section provides for judicial elections and refers to judges as holding "office[.]"), and was entitled to representation by the Attorney General, see Md. Code Ann., State Gov't (1984, 2014 Repl. Vol.) § 6-106(b) ("Unless a law expressly provides for a general counsel as the legal adviser and representative of the officer or unit, the Attorney General is the legal adviser of and shall represent and otherwise perform all of the legal work for each officer and unit of the State government."). And, because the election was over, and the results certified, when the petition was filed, neither Appellant nor Judge Turner was a candidate for judicial office. As such, contrary to Appellant's contention, the Attorney General's representation of Judge Turner did not "assist one candidate over the other to win a judicial election." (Citation omitted). Rather, the Attorney General represented all of the State defendants, consisting of three State officials and one State agency, in an action that involved a challenge to an election that had occurred more than six months earlier.

- 20 -

202(b) and barred by the doctrine of the laches.

## The Parties' Contentions

Appellant contends that neither EL § 12-202(b)'s statutory limitations period nor the doctrine of laches applies in this case. Appellant argues that Art. IV, § 5 of the Constitution of Maryland requires that "Judge Turner's qualifications be verified[,]" and that applying EL § 12-202(b)'s statutory limitations period would conflict with that constitutional requirement. (Bolding omitted). Alternatively, Appellant asserts that Judge Turner's alleged "inequitable conduct" justifies tolling EL § 12-202(b)'s statutory limitations period. (Bolding omitted). Specifically, Appellant maintains that, in becoming a judge, Judge Turner committed fraud and constructive fraud on the taxpayers. As to this point, Appellant contends, in pertinent part:

> [Judge] Turner did not care whether she was qualified, which is shown when she bragged to [T]he [Washington] Post about her ability to beat the odds in her life[]time. [Judge] Turner also did not proffer an affidavit to the [circuit] court demonstrating her due diligence to assess her qualifications. Thus[, Judge] Turner's unclean hands created the wrong in which Appellant seeks relief.

(Citations omitted). Appellant argues that she "was entirely justified in" filing and awaiting resolution of the ethics complaint by the Commission "because [Judge] Turner's lack of qualifications and prohibited political activity during the 2016 election cycle [were] so prejudicial to the administration of justice that [they] could have resulted in her removal." Appellant asserts that the filing of the complaint with the Commission provided notice to Judge Turner of Appellant's claims to disqualify her candidacy; Appellant maintains that this filing satisfied the purpose of the statute of limitations.

- 21 -

Appellant contends that the doctrine of laches does not apply because there was no inexcusable delay or prejudice. Appellant asserts that she "has been diligent in pursuing her claims with the [Commission] and" in the circuit court. According to Appellant, there is no prejudice to Judge Turner because she has known since the filing of the ethics complaint that Appellant is challenging "the legitimacy and integrity of her candidacy[.]"

Appellees respond that a registered voter must seek judicial relief in the circuit court within the timeframe that is specified by EL § 12-202(b), which ensures that an election claim is processed expeditiously and without unreasonable delay. Appellees contend that, here, Appellant waited six months after the election before filing the petition, despite having become aware of the facts that served as the basis for the election claims in April 2016, when The Washington Post's article was published. According to Appellees, under the circumstances, the circuit court correctly ruled that Appellant failed to file the election claims within EL § 12-202(b)'s statutory limitations period. Appellees argue that Appellant confuses eligibility for judicial office—*i.e.*, having the requisite qualifications such as residency, age, and bar membership—with the process of qualifying for judicial office, which includes receiving a commission, taking an oath, and posting any applicable bond. Appellees argue that the use of the term "qualification" in Art. IV, § 5 of the Constitution of Maryland refers to the process of qualifying for judicial office, not an individual's eligibility for judicial office, and thus does not provide a basis on which to challenge a candidate's eligibility more than six months after an election.

Appellees assert that the filing of the ethics complaint with the Commission concerning Judge Turner's campaign conduct did not toll EL § 12-202(b)'s statutory

limitations period for an election claim concerning Judge Turner's eligibility. Appellees maintain that equitable tolling applies only where a plaintiff has been tricked or induced by a defendant's conduct into not filing a claim within the limitations period—*i.e.*, there must be some wrongful conduct by the defendant. Appellees contend that, in this case, the circuit court properly concluded that equitable tolling did not apply because Appellant was neither tricked nor induced into delaying in filing the election claims. Appellees argue that, instead, Appellant decided of her own accord to await the outcome of the ethics complaint with the Commission before filing the petition in the circuit court.

Appellees also assert that the election claims, which were filed more than six months after the election, are barred by the doctrine of laches. Appellees maintain that Appellant knowingly failed to file the election claims expeditiously, and that the delay prejudiced Judge Turner, who relied upon the initial certification of her candidacy and later on the certification of the election results. Appellees argue that the delay may also prejudice the voters of Prince George's County, and in particular those who voted for Judge Turner, because they may have their votes invalidated.

**Standard of Review**

In State Ctr., LLC v. Lexington Charles Ltd. P'ship, 438 Md. 451, 496-97, 92 A.3d 400, 426-27 (2014), this Court explained that we review without deference a trial court's grant of a motion to dismiss to determine whether the ruling was legally correct, stating:

> Considering a motion to dismiss a complaint for failure to state a claim upon which relief may be granted, a court must assume the truth of, and view in a light most favorable to the non-moving party, all well-pleaded facts and allegations contained in the complaint, as well as all inferences that may reasonably be drawn from them, and order dismissal only if the allegations

and permissible inferences, if true, would not afford relief to the plaintiff, *i.e.*, the allegations do not state a cause of action for which relief may be granted.  Consideration of the universe of "facts" pertinent to the court's analysis of the motion are limited generally to the four corners of the complaint and its incorporated supporting exhibits, if any.  The well-pleaded facts setting forth the cause of action must be pleaded with sufficient specificity; bald assertions and conclusory statements by the pleader will not suffice.  Upon appellate review, the trial court's decision to grant such a motion is analyzed to determine whether the court was legally correct.

(Citation omitted).  Similarly, where a trial court considers materials outside of the pleadings, such as an affidavit, it is appropriate to treat the trial court's grant of a motion to dismiss as a motion for summary judgment, and "[w]e review all questions of law, including whether summary judgment was properly granted, without deference." Vito v. Grueff, 453 Md. 88, 104, 160 A.3d 592, 601 (2017) (citations omitted).  Moreover, "insofar as [the circuit court's decision] rested on the interpretation of the Election Law Article[,]" "[w]e review *de novo*" the circuit court's decision. Cabrera v. Penate, 439 Md. 99, 106, 94 A.3d 50, 54 (2014) (citation omitted).  And, "[w]here the issue is whether a party is precluded by [the doctrine of] laches from challenging an action of another party, we shall review the trial court's ultimate determination of the issue *de novo*." Schlakman, 451 Md. at 480, 153 A.3d at 151 (cleaned up).

### EL § 12-202

EL § 12-202, concerning judicial challenges to elections, provides, in its entirety:

(a) *In general*. — If no other timely and adequate remedy is provided by this article, a registered voter may seek judicial relief from any act or omission relating to an election, whether or not the election has been held, on the grounds that the act or omission:

(1) is inconsistent with this article or other law applicable to the elections process; and

(2) may change or has changed the outcome of the election.

(b) *Place and time of filing*. — A registered voter may seek judicial relief under this section in the appropriate circuit court within the earlier of:

(1) 10 days after the act or omission or the date the act or omission became known to the petitioner; or

(2) 7 days after the election results are certified, unless the election was a gubernatorial primary or special primary election, in which case 3 days after the election results are certified.

Significantly, EL § 12-202 "is the mechanism for challenging the qualifications of a candidate seeking election." Schlakman, 451 Md. at 482, 153 A.3d at 152 (cleaned up). See also Cabrera, 439 Md. at 109, 94 A.3d at 56. In Schlakman, 451 Md. at 482, 153 A.3d at 152, we described EL § 12-202 as follows:

[EL §] 12-202 . . . governs judicial challenges to certain irregularities in relation to an election; it provides judicial redress for any act or omission that violate the Election Law Article. . . . [EL] § 12-202(b)[,] by its terms, affords a party the opportunity to challenge irregularities as elaborated in [EL] § 12-202(a) by seeking judicial relief in the appropriate circuit court, and constitutes general judicial review authority when no other Election Law provisions apply.

(Cleaned up).

EL § 12-202(b) provides "a statutory limitations period" in which an election claim must be filed. Id. at 485, 153 A.3d at 154. The purpose of EL § 12-202(b), the statute of limitations for election claims, is to ensure that "any claim against a [S]tate electoral procedure [is] expressed expeditiously, [and] without unreasonable delay, so as to not cause prejudice to the defendant." Liddy v. Lamone, 398 Md. 233, 245, 919 A.2d 1276, 1284 (2007) (cleaned up). Notably, as the Court of Special Appeals has recognized, "the

- 25 -

very short time limits for filing a suit challenging an aspect of an election pursuant to EL § 12-202(b) are evidence of this State's public policy that claims for judicial relief relative to an election must be prosecuted without delay." Baker, 217 Md. App. at 296, 92 A.3d at 593. Indeed, a registered voter who fails to file an action within the statutory limitations period risks having his or her judicial challenge dismissed as untimely.

Under certain circumstances, a statute of limitations may be tolled, *i.e.*, stopped. In Booth Glass Co., Inc. v. Huntingfield Corp., 304 Md. 615, 623, 500 A.2d 641, 645 (1985), this Court stated that "[w]e have long adhered to the principle that[,] where the [General Assembly] has not expressly provided for an exception in a statute of limitations, the court will not allow any implied or equitable exception to be engrafted upon it." (Citations omitted). We noted, as one example, an exception to the general three-year statute of limitations for civil actions where "a party is kept in ignorance of a cause of action by the fraud of an adverse party"; in that circumstance, the cause of action accrues—*i.e.*, the statute of limitations begins to run—"when the fraud is discovered."[13] Booth Glass, 304 Md. at 623-24, 500 A.2d at 645 (cleaned up). As to whether equitable estoppel may toll a statute of limitations, we stated: "In Maryland, [] it is well settled that equitable estoppel will not toll the running of limitations absent a showing that the defendant held out any inducements not to file suit or indicated that limitations would not be pleaded." Id. at 624, 500 A.2d at 645 (cleaned up). More recently, in Adedje v. Westat, Inc., 214 Md. App. 1,

---

[13]Specifically, Md. Code Ann., Cts. & Jud. Proc. (1974, 2013 Repl. Vol.) § 5-203 provides: "If the knowledge of a cause of action is kept from a party by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered[,] the fraud."

13, 75 A.3d 401, 408 (2013), the Court of Special Appeals explained that "equitable tolling seeks to excuse untimely filing by an individual plaintiff[,] and is generally applicable where the plaintiff has been induced or tricked by the defendant's conduct into allowing the filing deadline to pass." (Cleaned up). Stated otherwise, for equitable estoppel to toll a statute of limitations, a plaintiff must show that there was some wrongful conduct on the part of the defendant that prevented the plaintiff from asserting his or her claim.

**The Doctrine of Laches**

The doctrine of "[l]aches is a defense in equity against stale claims[ that] is based upon grounds of sound public policy by discouraging fusty demands for the peace of society." Ross, 387 Md. at 668, 876 A.2d at 703 (cleaned up). This Court has explained that "[t]he doctrine of laches, which is both an affirmative defense and an equitable defense, applies where there is an unreasonable delay in the assertion of one party's rights[,] and that delay results in prejudice to the opposing party." Jones, 445 Md. at 339, 126 A.3d at 1171 (cleaned up). Application of the doctrine of laches is determined on a case-by-case basis. See Schlakman, 451 Md. at 485, 153 A.3d at 154 ("[T]here is no inflexible rule as to what constitutes, or what does not constitute, laches; hence, its existence must be determined by the facts and circumstances of each case." (Cleaned up)). Significantly, the doctrine of laches has been invoked in the context of election cases and held to bar a plaintiff's election claims. This is so because this Court has recognized that, to avoid prejudice to a defendant, "any claim against a [S]tate electoral procedure must be expressed expeditiously[ and] without unreasonable delay[.]" Liddy, 398 Md. at 245, 919 A.2d at 1284 (cleaned up).

Recently, in Schlakman, 451 Md. at 473, 485, 153 A.3d at 147, 154, this Court held that the plaintiffs' challenge "to a candidate's qualifications to appear on the ballot" was "barred as a matter of law by [the doctrine of] laches." In Schlakman, id. at 473, 153 A.3d at 147, the plaintiffs, along with an individual named Dan Sparaco, were candidates in the 2016 general election for the Councilmanic District Twelve seat on the Baltimore City Council. On January 13, 2016, Sparaco, an independent candidate, filed a campaign finance report with the State Board of Elections. See id. at 475, 153 A.3d at 148. Sparaco did not file a declaration of intent by February 3, 2016; instead, on May 20, 2016, Sparaco filed in the United States District Court for the District of Maryland a complaint "challenging the constitutionality of the early filing deadline for unaffiliated candidates." Id. at 475-76, 153 A.3d at 148-49 (cleaned up). On August 15, 2016, Sparaco voluntarily dismissed the federal case. See id. at 476, 153 A.3d at 149. In the meantime, on July 11, 2016, Sparaco filed with the Baltimore City Board of Elections a declaration of intent to seek nomination by petition for the District Twelve seat, and, on August 2, 2016, that board approved the petition signatures and certified Sparaco's candidacy. See id. at 476, 153 A.3d at 149. Thereafter, the State Board of Elections included Sparaco's name on the ballot; and, on August 31, 2016, it posted on its website ballot proofs that included Sparaco's name. See id. at 476, 153 A.3d at 149.

The plaintiffs challenged the Baltimore City Board of Elections's decision to certify Sparaco as an eligible candidate and the State Board of Elections's decision to include him as a candidate on the ballot, contending that Sparaco had failed to timely comply with statutory filing requirements, and, therefore, was disqualified. See id. at 473, 153 A.3d at

147.  Initially, on August 25, 2016, the plaintiffs filed an action in the United States District Court for the District of Maryland against the State Board of Elections, but the federal court dismissed the case because the plaintiffs' counsel had not been admitted to practice before the federal court.  See id. at 473, 153 A.3d at 147.  Then, on September 20, 2016, the plaintiffs filed in a State trial court a complaint against the Administrator of the State Board of Elections and the Election Director of the Baltimore City Board of Elections.  See id. at 473-74, 153 A.3d at 147.  Two days later, on September 22, 2016, in response to the plaintiffs' *ex parte* request for an immediate temporary restraining order, the trial court issued a temporary restraining order that required the defendants to remove Sparaco's name from ballots.  See id. at 474, 153 A.3d at 147-48.  Thereafter, we granted the defendants' petition for a writ of *certiorari*.  See id. at 474, 153 A.3d at 148.

In this Court, the defendants contended that the plaintiffs' complaint was untimely because it was not filed within the time period specified by EL § 12-202(b)(1), and argued that the challenge was also barred by the doctrine of laches.  See id. at 483, 153 A.3d at 153.  At the outset, we noted that, "because the action before us [was] an equitable one, [the doctrine of] laches, rather than direct application of the statutory time period, [was] the proper focus[,]" but that we could "gauge the[ plaintiffs'] delay against the statutory limitations period because courts sitting in equity will apply statutory time limitations in determining, at least as an outside limit, whether laches has run."  Id. at 484, 153 A.3d at 153 (cleaned up).  We stated that "a statutory limitations period, such as that provided by [EL] § 12-202(b)(1), provides a benchmark for the application of [the doctrine of] laches . . . against which this Court can assess whether the [plaintiff]s' delay in filing in the [trial

- 29 -

c]ourt was unreasonable and whether it prejudiced the interests of [the defendant]s." Id. at 485, 153 A.3d at 154.

Applying these principles, this Court concluded that the plaintiffs' complaint was barred by the doctrine of laches, explaining:

> Even granting, *arguendo*, that [the plaintiffs] did not learn of the [Baltimore] City Board[ of Elections]'s certification of [] Sparaco's candidacy until August 15, 2016, [the date on which Sparaco voluntarily dismissed his complaint in the federal court,] their challenge under [EL] § 12-202(a) came too late because they did not file the instant action in the [c]ircuit [c]ourt . . . until September 20, 2016, when their complaint was docketed by the clerk[,] and, on this record, their delay was unreasonable and prejudicial to [the defendant]s and the election process.

Id. at 485, 153 A.3d at 154 (footnote omitted). We determined that there was "no basis . . . to hold that [the plaintiff]s' obligation to file in the appropriate circuit court, as instructed by [EL] § 12-202(b)(1)[,] was tolled by their failed attempt to" obtain relief in the federal court. Id. at 486, 153 A.3d at 155. We observed that the plaintiffs had "offered no valid explanation as to why they waited until September 20[, 2016,] to" file the complaint in the State trial court, despite having notice of Sparaco's certification on August 15, 2016. Id. at 488, 490, 153 A.3d at 156, 157. As a final point, we noted that the plaintiffs failed to explain "why they did not institute a parallel action in the [trial c]ourt within the time limits mandated by [EL] § 12-202(b)." Id. at 490, 153 A.3d at 157.

In Liddy, 398 Md. at 236, 919 A.2d at 1278-79, this Court held that the doctrine of laches barred a plaintiff's election claim where the plaintiff filed a complaint eighteen days before the 2006 general election, alleging that Douglas F. Gansler, the Democratic Party's nominee for Attorney General, was ineligible because he allegedly had not practiced law

in Maryland for at least ten years. We held that the trial court "erred in not invoking the doctrine of laches as a bar to the [plaintiff]'s untimely claim when it placed the determination of a candidate's eligibility ahead of the urgency of the election itself and the possible disenfranchisement of Maryland voters." Id. at 249-50, 919 A.2d at 1287. We explained that permitting "challenges to be brought at such a late date would call into question the value and the quality of our entire elections process[,] and would only serve as a catalyst for future challenges. Such delayed challenges go to the core of our democratic system[,] and cannot be tolerated." Id. at 255, 919 A.2d at 1291.

As to unreasonable delay, we observed that the plaintiff filed the complaint on October 20, 2006, only eighteen days before the 2006 general election; that, on October 25, 2006, the trial court conducted a hearing in the case; and that, on November 2, 2006, this Court heard oral argument, "leaving only 5 days remaining before the general election." Id. at 252, 919 A.2d at 1288-89. We explained that, "notwithstanding that the [plaintiff]'s filing may have been within the governing statutory provisions [that are] outlined in the Election Law Article, his failure diligently to pursue his challenge left this Court, as well as the [trial] court [], a very brief time in which to consider and decide th[e] matter." Id. at 252, 919 A.2d at 1289 (citation omitted). We determined that the untimely filing of the complaint prejudiced Gansler, who relied on the initial certification of his candidacy and the certification of the primary election results, and we pointed out that the plaintiff's challenge could have been brought as early as anytime after June 28, 2006, when Gansler filed his certification of candidacy. See id. at 253, 919 A.2d at 1289. Significantly, we concluded that the delay prejudiced the electorate as a whole, explaining:

> The relief [that was] sought by the [plaintiff], *i.e.* the removal of Gansler's name from the ballot, or, in the alternative, signs being posted to indicate Gansler's ineligibility to voters, would have caused a great deal of uncertainty in the entire election process. The confusion that would have resulted from such last-minute changes would have, indubitably, interfered with the rights of Maryland voters, particularly those who had already cast absentee ballots, causing them to be disenfranchised and the value of their votes diluted[,] as they would not be able to vote again.

Id. at 254-55, 919 A.2d at 1290.

In Ross, 387 Md. at 668 & n.8, 672-73, 876 A.2d at 703 & n.8, 705-06, this Court determined that an action that was arguably filed within the statutory limitations period of EL § 12-202(b)—*i.e.*, before the election results were certified, and within ten days after the plaintiff had knowledge of the challenged act or omission—was nevertheless barred by the doctrine of laches. On June 30, 2003, Paula Johnson Branch filed a certificate of candidacy to run for the Thirteenth Councilmanic District seat on the Baltimore City Council. See id. at 654, 876 A.2d at 694. In September 2003, Branch won the Democratic primary election. See id. at 654, 876 A.2d at 694. Then, throughout 2003 and 2004, two campaign finance entities raising funds for Branch's campaign failed to file required campaign finance reports; and, a newspaper article dated October 13, 2004 mentioned that a committee supporting Branch was delinquent in filing its campaign finance reports, and that the plaintiff, who was the Green Party candidate for the same seat, was raising it as an issue during the campaign. See id. at 654-55, 876 A.2d at 694-95. On October 22, 2004, the plaintiff's campaign e-mailed the State Board of Elections to request that it discuss Branch's disqualification at its October 26, 2004 meeting; the State Board considered the matter at that meeting, but declined to act. See id. at 655, 876 A.2d at 695. Branch

ultimately remained on the ballot, and, on November 2, 2004, won the general election. See id. at 656, 876 A.2d at 696. Three days after the election, on November 5, 2004, the plaintiff filed a petition in the Circuit Court for Baltimore City, requesting that the Baltimore City Board of Canvassers be enjoined from certifying Branch as the victor, that Branch be declared ineligible to be a candidate, that the election for the Thirteenth Councilmanic District seat be declared void, and that a new election be held. See id. at 656, 876 A.2d at 696.

In Ross, id. at 658, 876 A.2d at 697, we held that the plaintiff's claims were untimely under the doctrine of laches. We explained:

> [The plaintiff]'s petition . . . was governed by [EL §] 12-202 [], which provides for a ten-day "window" for seeking judicial redress for an act or omission that violates the Election Law Article and has[ changed,] or would change[,] the outcome of the election once the registered voter [knew] of it. [The plaintiff] appears to concede, by attaching the [newspaper] article to his initial petition filed in the [trial c]ourt, that he knew of Branch's campaign finance entity's failure to file campaign finance reports on October 13[, 2004]. Thus, under the operation of the ten-day time period in [EL §] 12-202, [the plaintiff] should have filed his petition at least a week before the election, that is, by October 23[, 2004]. Instead, he waited until November 5[, 2004], a full three days after the election occurred. Therefore, we find that it is barred as a matter of law by the common[-]law doctrine of laches as argued by [the defendant]s[.]

Id. at 667-68, 876 A.2d at 703. In a footnote immediately following our holding, we stated: "Even if we were to agree with [the plaintiff] that the ten-day time period under [EL §] 12-202 began to run on October 26[, 2004], when the State Board [of Elections] declined to act, his action would remain barred by [the doctrine of] laches." Id. at 668 n.8, 876 A.2d at 703 n.8.

As to unreasonable delay, we noted that the plaintiff had failed to provide any

- 33 -

explanation for the delay in filing the petition three days after the election, and concluded that the plaintiff's "wait and see" strategy was an unjustifiable delay "that prejudiced Branch, the State Board of Elections, and the residents of the Thirteenth Councilmanic District." Id. at 672, 876 A.2d at 705-06. We explained that "a candidate or other election participant should not be allowed to ambush an adversary or subvert the election process by intentionally delaying a request for remedial action to see first whether [he or she] will be successful at the polls." Id. at 672, 876 A.2d at 705-06 (cleaned up). As to prejudice, we elaborated:

> Branch relied upon her certification by the State Board [of Elections] as a qualified candidate for the office and the result of the election in which she overwhelmingly won, only to have the results belatedly challenged on a ground that was ripe prior to Election Day. The State Board [of Elections] likewise was prejudiced because it too relied upon the correctness of the ballots and expended considerable efforts in overseeing the election when Branch's candidacy could have been protested judicially prior to the election on November 2nd. Most importantly, [the plaintiff]'s actions also prejudiced the electorate as a whole by denying them the efficacy of their vote and undermining their faith in a free and fair election. Thus, because [the plaintiff]'s delay would result in [the defendant]s and the people of the Thirteenth Councilmanic District being placed in a less favorable position due to their justifiable reliance on the circumstances in existence on Election Day, we find [the plaintiff]'s actions sufficiently prejudicial so as to warrant the application of [the doctrine of] laches.

Id. at 672-73, 876 A.2d at 706. See also Baker, 217 Md. App. at 298, 92 A.3d at 594-95 (The Court of Special Appeals concluded that a plaintiff's petition for a writ of mandamus was barred by the doctrine of laches, and explained that, although the plaintiff initially filed the petition approximately five-and-a-half months after the governor declined to issue her a commission, "under *Ross* and *Liddy*, a delay of even that magnitude would constitute an unreasonable delay in challenging a governor's failure to issue a commission after an

- 34 -

election.").

## Analysis

Here, we hold that the circuit court correctly granted the motion to dismiss and concluded that Appellant's petition was untimely under EL § 12-202(b) because Appellant did not file the petition in the circuit court until May 9, 2017, more than six months after the 2016 general election, and more than one year after Appellant admittedly became aware of the facts that served as the basis for the election claims; and, the petition was filed at least several months after the election results were certified. Further, there is no basis on which to toll the statute of limitations. We hold that, independent of the statutory limitations period set forth in EL § 12-202(b), the petition is barred by the doctrine of laches because, in filing the petition in the circuit court more than six months after the 2016 general election, Appellant unreasonably delayed in asserting her rights, and that delay prejudiced Appellees. We turn first to EL § 12-202. As an initial matter, it is evident that the election claims—concerning Judge Turner's alleged ineligibility, *i.e.*, lack of qualifications, for office of judge of the Circuit Court for Prince George's County— constitute a challenge to the qualifications, *i.e.*, eligibility, of a candidate seeking election and, thus, fall within the purview of EL § 12-202(a). In other words, EL § 12-202 applies.

Appellant was required to file the petition in the circuit court within the statutory limitations period specified in EL § 12-202(b)—namely, "within the earlier of: (1) 10 days after the act or omission or the date the act or omission became known to [Appellant]; or (2) 7 days after the election results [were] certified[.]" (Paragraph breaks omitted). For purposes of EL § 12-202(b)(1), we must examine the date on which the act or omission

- 35 -

became known to Appellant, *i.e.*, the date on which Appellant became aware of the facts that served as the basis for the election claims. A review of the record leads to the conclusion that Appellant became aware of Judge Turner's alleged ineligibility, or lack of qualifications, to be a judge when or shortly after The Washington Post published its article about the contested judicial election, setting forth information about Judge Turner's legal practice background. The record demonstrates that, on April 21, 2016, prior to the 2016 primary election, The Washington Post published an article containing information about Judge Turner, including the circumstances that Judge Turner had been a military lawyer and a member of the Prince George's County Council, and that Judge Turner apparently had "little experience in local courts." Significantly, in an affidavit that she filed in support of the motion for summary judgment, Appellant averred that she "had no knowledge of [Judge] Turner's legal practice history until [T]he Washington Post['s] article[] dated April 21, 2016 had been published[,] and [the Commission] was invest[igat]ing [Judge] Turner." During the hearing in the circuit court, Appellant argued that, a few days before the 2016 primary election, The Washington Post's "article came out[,] outlining everyone's qualifications and criticizing [Judge] Turner for her motives [in] switching [from] the congressional race to the judge race[,] and also criticizing her qualifications." Appellant explained that, upon seeing the article, "[t]hat is actually when [she] found out that [Judge] Turner] ha[d] never practiced law. And [Appellant] actually started researching her bio[graphie]s on[]line, asking some people. No, [Judge Turner] has never practiced law in this State." At oral argument, Appellant asserted that she did not discover that Judge Turner "did not meet the constitutional qualifications" until after Judge Turner won the

2016 primary election. At oral argument, Appellant stated that she did not "figure[] out" that Judge Turner was ineligible until after she had filed the ethics complaint with the Commission, and Appellant advised this Court that she supplemented the ethics complaint with information about the eligibility issue.

In our view, despite Appellant's attempt to give a different impression, her statements at oral argument are wholly consistent with the conclusion that she became aware of The Washington Post's article and Judge Turner's alleged ineligibility for judicial office in late April 2016 or shortly thereafter. The record reveals the following straightforward sequence of events: (1) on April 14, 2016, Appellant filed the ethics complaint with the Commission; (2) on April 21, 2016, The Washington Post's article was published; and (3) on April 26, 2016, the 2016 primary election occurred. In other words, as of the dates of The Washington Post's article and the 2016 primary election, the ethics complaint was pending with the Commission. In the circuit court, Appellant was clear that she saw The Washington Post's article when it was published, and, as a result, became aware of Judge Turner's legal practice background. In other words, in the circuit court, Appellant did not allege that she saw The Washington Post's article only shortly before filing the petition on May 9, 2017, or that she had only recently become aware of Judge Turner's legal practice background; indeed, nothing in the record supports the inference that Appellant became aware of the facts underlying the election claims at some point other than in April 2016 or shortly thereafter. And, both of Appellant's statements at oral argument in this Court—that she did not discover Judge Turner's ineligibility for judicial office until after the 2016 primary election, and that she did not "figure[] out" that Judge

Turner was ineligible until after the filing of the ethics complaint—refer to events that occurred in April 2016, *i.e.*, the primary election on April 26, 2016, and the filing of the ethics complaint on April 14, 2016. Appellant advised this Court that she raised the eligibility issue with the Commission by providing supplements to it after the ethics complaint had been filed. Simply put, Appellant's statements at oral argument confirm, rather than contradict, the conclusion that Appellant became aware of the basis for the election claims after reading The Washington Post's article when or shortly after it was published on April 21, 2016.

Interestingly, on brief, in a section labeled "Statement of the Case," Appellant states, without any citation to the record:

> Prior to filing the action[,] and upon learning of [Judge] Turner being sworn, on January 9, 2017, [Appellant] gave notice to the Attorney General that she was awaiting a decision on the disqualification of [Judge] Turner from [the Commission], and [Appellant] would be seeking judicial intervention, if necessary, to declare her the qualified winner of the election.

At oral argument, however, Appellees' counsel advised the Court that Appellees did not have a copy of such notice, and that no such notice was contained in the record. Appellees' counsel advised that she had received various e-mails from Appellant, in which Appellant asserted her right to Judge Turner's judgeship, but that she had not received the notice to which Appellant referred on brief. Appellees' counsel stated that she was unaware of any type of "official notice" that Appellant gave concerning her intent to file an action. Notwithstanding that Appellees' counsel did not receive the notice to which Appellant referred, Appellant's statements on brief demonstrate that, at a minimum, Appellant knew of any issue related to Judge Turner's eligibility for judicial office by January 9, 2017, the

- 38 -

date on which she claims to have provided notice to Appellees' counsel of her intent to await the outcome of the ethics complaint before filing a complaint in the circuit court. In other words, Appellant's own words in her brief confirm that she knew of the eligibility issue pertaining to Judge Turner by January 9, 2017 at the latest, yet Appellant still waited four months before filing the petition in the circuit court.

In addition to the record demonstrating that Appellant gained knowledge of Judge Turner's legal background when or shortly after The Washington Post's article was published, the issue of whether Judge Turner had been admitted to the Bar of Maryland or had practiced law in Maryland, *i.e.*, Judge Turner's legal practice background, is something that would have been easily ascertainable by Appellant through minimal investigation; *i.e.*, these are facts that would have been readily discernible in today's digital age. Indeed, after Judge Turner filed a certificate of candidacy, and even prior to the 2016 primary election, anyone could have easily investigated Judge Turner's background and found out whether she had been admitted to the Bar of Maryland, and whether she had practiced law in Maryland. For example, in the affidavit in support of the motion for summary judgment, Appellant averred that, on April 29, 2017, upon receiving notice of the disposition of the ethics complaint from the Commission, she "immediately verified [Judge] Turner's online official Maryland biographies[.]" Clearly, Appellant had the ability to access information about Judge Turner's professional background through minimal investigation, and there was no need to delay filing the petition in the circuit court.

In short, we determine that the record supports the conclusion that Appellant became aware of Judge Turner's alleged ineligibility, or lack of qualifications, to be a judge when

or shortly after The Washington Post published its article on April 21, 2016, and Appellant had the ability to uncover information about Judge Turner's legal background regardless of the publication of The Washington Post's article. The date on which Appellant actually became aware of the alleged act or omission underlying the election claims—on or shortly after April 21, 2016—is far earlier than the date on which the election results were certified, which occurred after November 8, 2016.[14] Under EL § 12-202(b)(1), Appellant was required to file the petition in the circuit court within ten days after the act or omission became known to her, which she failed to do; instead, Appellant waited until May 9, 2017, to file the petition in the circuit court. And, even if Appellant were unaware of the facts giving rise to the election claims until January 9, 2017—the date on which she states she notified the Attorney General that she was awaiting the Commission's decision on the ethics complaint before filing a complaint in the circuit court—it is undisputed that Appellant did not file the petition within ten days of that date either. Even were we to consider EL § 12-202(b)(2), instead of EL § 12-202(b)(1), as providing the relevant statutory limitations period, undisputedly, Appellant filed the petition in the circuit court

---

[14]The record does not reveal the date on which the 2016 general election results were certified. EL § 11-503(a)(1)(ii), however, requires the Board of State Canvassers to "convene within 35 days of" a State general election, and EL § 11-503(a)(4) requires the Board of State Canvassers to "prepare and transmit a certified statement of the election results to the State Board of Elections." In a document entitled "2016 Presidential Election Calendar," the State Board of Elections identified December 13, 2016, as the deadline for the State Board of Canvassers to convene to certify the election results, and December 14, 2016, as the date on which the State Board of Elections was to "deliver to the winners of the general election a certified statement under its seal." Maryland State Board of Elections, 2016 Presidential Election Calendar, at 9 (Aug. 26, 2016), available at http://www.elections.state.md.us/elections/2016/2016_Election_Calendar.pdf [https://perma.cc/2UNV-VHL7].

on May 9, 2017, more than six months after the 2016 general election, and long after the 2016 general election results had been certified. Under either deadline set forth in EL § 12-202(b), Appellant's filing of the petition more than six months after the 2016 general election was untimely, and, accordingly, EL § 12-202(b) bars the election claims.

Contrary to Appellant's assertion, we are unconvinced that Art. IV, § 5 of the Constitution of Maryland offers any support for the notion that the "qualification" of a judicial officer may be challenged after the timeframe set forth in EL § 12-202(b). Art. IV, § 5 simply does not provide a basis on which to dispute a candidate's eligibility for judicial office months after an election occurs, and months after the candidate becomes a judge. Indeed, as Appellees contend, it appears that Appellant fails to appreciate the distinction between a candidate's eligibility for judicial office—*i.e.*, circumstances such as residency, age, and bar membership—and the process of qualifying for office—*i.e.*, receiving a commission, taking an oath, and posting any applicable bond. Art. IV, § 2 of the Constitution of Maryland, concerning judicial qualifications, provides:

> The Judges of all of the said Courts shall be citizens of the State of Maryland, and qualified voters under this Constitution, and shall have resided therein not less than five years, and not less than six months next preceding their election, or appointment, as the case may be, in the city, county, district, judicial circuit, intermediate appellate judicial circuit[,] or appellate judicial circuit for which they may be, respectively, elected or appointed. They shall be not less than thirty years of age at the time of their election or appointment, and shall be selected from those who have been admitted to practice Law in this State, and who are most distinguished for integrity, wisdom[,] and sound legal knowledge.

In other words, Art. IV, § 2 sets forth certain requirements that a candidate must meet to be eligible to be a judge in this State, including requirements as to residency, age, and

- 41 -

membership in the Bar of Maryland.

By contrast, to qualify for office, *i.e.*, the process of assuming office, Art. I, § 10 of the Constitution of Maryland provides, in relevant part:

> Any officer elected or appointed in pursuance of the provisions of this Constitution, may qualify, either according to the existing provisions of law, in relation to officers under the present Constitution, or before the Governor of the State, or before any Clerk of any Court of Record in any part of the State; but in case an officer shall qualify out of the County in which he [or she] resides, an official copy of his [or her] oath shall be filed and recorded in the Clerk's office of the Circuit Court of the County in which he [or she] may reside, or in the Clerk's office of the Superior Court of the City of Baltimore, if he [or she] shall reside therein.

Art. I, § 10 expressly authorizes the Governor or the clerk to qualify an officer by administering the necessary oath. Thus, Art. I, § 10 refers to an officer qualifying for office, *i.e.*, taking the oath of office.

Art. IV, § 5 of the Constitution of Maryland—the provision on which Appellant relies—concerns a vacancy in the office of a circuit court judge, and provides that, upon the occurrence of a such a vacancy, "the Governor shall appoint a person duly qualified to fill said office, who shall hold the same until the election and qualification of his successor." Obviously, Art. IV, § 5's use of the phrase "duly qualified" refers to the individual's eligibility for judicial office and whether that individual satisfies the requirements set forth in Art. IV, § 2, whereas Art. IV, § 5's use of the word "qualification" means taking the oath of office, and does not mean determining whether the individual meets the applicable eligibility requirements. In any event, significantly, Art. IV, § 5 does not provide a basis or mechanism through which a registered voter may challenge a candidate's eligibility, *i.e.*, qualifications, to seek judicial office; rather, as stated, EL § 12-

- 42 -

202 provides such a mechanism by permitting a judicial challenge within the statutory limitations period specified in EL § 12-202(b). Contrary to Appellant's assertion, we discern no conflict between Art. IV, § 5 and EL § 12-202, such that EL § 12-202(b)'s statutory limitations period is unconstitutional or otherwise inapplicable under the circumstances of this case.

Likewise, we reject Appellant's contention that EL § 12-202(b) is tolled either due to wrongdoing on Judge Turner's part, or because Appellant filed the ethics complaint with the Commission. Setting aside the issue of whether the General Assembly has expressly permitted an exception to the statute of limitations set forth in EL § 12-202(b), see Booth Glass, 304 Md. at 623, 500 A.2d at 645 ("[W]here the [General Assembly] has not expressly provided for an exception in a statute of limitations, the court will not allow any implied or equitable exception to be engrafted upon it." (Citations omitted)), we fail to discern any basis on which to toll the statute of limitations. There is nothing in the record that indicates that Appellant was "induced or tricked by [Judge Turner] into allowing the filing deadline to pass." Adedje, 214 Md. App. at 13, 75 A.3d at 408 (citations omitted). Appellant's bare allegations that Judge Turner committed fraud on the taxpayers to secure her position as a judge and that Judge Turner has unclean hands are insufficient to establish that Judge Turner engaged in wrongful conduct that prevented Appellant from asserting the election claims. Rather, as the record demonstrates, on or shortly after April 21, 2016, Appellant became aware of Judge Turner's candidacy and eligibility for office, *i.e.*, of the basis for the election claims, and Appellant was neither tricked nor induced into delaying filing the petition in the circuit court until May 9, 2017, over a year later. Instead, according

to Appellant herself, she elected to await the outcome of the ethics complaint with the Commission before filing the petition in the circuit court. We are unable to identify any wrongful conduct on Judge Turner's part that resulted in Appellant's delay in filing the petition in the circuit court.

We are unpersuaded that the filing of the ethics complaint with the Commission tolls the statute of limitations for the election claims filed in the circuit court. Indeed, the ethics complaint that Appellant filed with the Commission concerned Judge Turner's conduct as a judicial candidate during a campaign, and alleged that Judge Turner had committed various ethical violations during the campaign by engaging in prohibited political activities. By contrast, the petition filed in the circuit court concerned Judge Turner's eligibility as a judicial candidate, not alleged campaign misconduct. Plainly put, the substance of the ethics complaint was distinct from that of the petition. And, even if Appellant had supplemented the ethics complaint with the issue of Judge Turner's eligibility for judicial office, the Commission would have been unable to address that issue because the responsibility for determining a candidate's eligibility to run for office rests with the courts through an action under EL § 12-202. The filing of the ethics complaint with the Commission does not support tolling of EL § 12-202(b)'s statutory limitations period, and does not excuse Appellant's failure to timely challenge Judge Turner's eligibility for office under EL § 12-202.

Independent of our holding that the election claims are barred by EL § 12-202(b) due to the untimely filing of the petition in the circuit court, we hold that the doctrine of laches bars the election claims. In filing the petition in the circuit court more than six

- 44 -

months after the 2016 general election, there was an unreasonable delay in Appellant's assertion of the election claims, and that delay resulted in prejudice to Appellees. Appellant's filing of the petition in the circuit court on May 9, 2017, more than six months after the 2016 general election, and over a year after Appellant became aware of the facts that formed the basis for the election claims, constitutes a clear-cut example of unreasonable delay for purposes of the doctrine of laches. As we noted in Schlakman, 451 Md. at 485, 153 A.3d at 154, the statutory limitations period set forth in EL § 12-202(b) "provides a benchmark for the application of [the doctrine of] laches . . . against which this Court can assess whether [Appellant's] delay in filing in the [c]ircuit [c]ourt was unreasonable[.]" Under EL § 12-202(b)(1) or (2), Appellant was required to file the petition in the circuit court within ten days after she became aware of The Washington Post's article published on April 21, 2016, or within seven days after the 2016 general election results were certified. These dates—on or shortly after April 21, 2016, or shortly after the November 8, 2016 general election—provide a benchmark from which we may measure Appellant's delay in filing the petition. When compared to either date, Appellant's filing of the petition on May 9, 2017, is simply unreasonable.

It is evident that Appellant failed to act with the expediency that is required of election claims. As in Ross, 387 Md. at 672-73, 876 A.2d at 705-06, Appellant's "wait and see" strategy, waiting until more than six months after the general election and almost two weeks after the date of the letter in which the Commission notified Appellant of the outcome of the ethics complaint concerning matters other than those raised in the election claims, was an unjustifiable, intentional delay in the assertion of her rights. What we stated

- 45 -

in Ross, id. at 672, 876 A.2d at 705-06, applies with equal force here—"a candidate . . . should not be allowed to ambush an adversary or subvert the election process by intentionally delaying a request for remedial action to see first whether [he or she] will be successful at the polls." (Cleaned up). We observe that Appellant's delay in filing the petition was more egregious than the delays in Schlakman, Liddy, and Ross, all cases in which this Court concluded that there was unreasonable delay for purposes of the doctrine of laches. See Schlakman, 451 Md. at 490, 153 A.3d at 157 (delay in filing the complaint until over a month after the plaintiffs were on notice of the facts underlying the complaint); Liddy, 398 Md. at 252, 919 A.2d at 1288-89 (delay in filing the complaint until eighteen days before the general election); Ross, 387 Md. at 668, 876 A.2d at 703 (delay in filing the complaint until three days after the general election, despite being aware of the facts underlying the complaint over three weeks earlier).

As in Schlakman, 451 Md. at 488, 490, 153 A.3d at 156, 157, we observe that Appellant has "offered no valid explanation as to why" she waited until May 9, 2017, to file the petition in the circuit court, despite having notice of the facts forming the basis for the election claims when or shortly after The Washington Post's article was published on April 21, 2016, or why she "did not institute a parallel action [to the ethics complaint] in the [c]ircuit [c]ourt within the time limits mandated by [EL] § 12-202(b)." As to the latter point, at the hearing in the circuit court, when asked by the circuit court why she did not file a complaint in the court concerning Judge Turner's alleged lack of qualifications, in addition to the ethics complaint filed with the Commission, Appellant simply responded that she was waiting for the Commission "to handle" the ethics complaint and that she

believed "it made sense to allow the [] Commission to act first." Appellant explicitly acknowledged, however, that she "could have" pursued both the ethics complaint and the petition simultaneously. Appellant's explanation and acknowledgement demonstrate that Appellant knew of her rights, yet deliberately delayed and failed to expeditiously pursue the election claims, thereby unreasonably delaying in pursuing the claims.

In short, waiting until more than six months after the election to challenge a candidate's eligibility for judicial office was unreasonable, and provided no opportunity whatsoever for either the circuit court or this Court to assess the election claims before the 2016 general election. Cf. Liddy, 398 Md. at 252, 919 A.2d at 1289 (This Court observed that, despite the circumstance that the plaintiff's complaint was filed within the timeframe specified by the Election Law Article, the plaintiff's "failure diligently to pursue his challenge left this Court, as well as the [trial] court [], a very brief time in which to consider and decide th[e] matter[,]" specifically, leaving only five days between the date of oral argument and the general election.). Obviously, in this case, by the time that Appellant filed the petition, the election results were certified, and Judge Turner had assumed the office of judge of the Circuit Court for Prince George's County, and was an active judge in this State.

Appellant's unreasonable delay in bringing the election claims in the circuit court prejudiced Appellees. As an initial matter, we reject Appellant's bald assertion that there is no prejudice because, if Judge Turner is ineligible for judicial office, then it would actually be beneficial to the State and the voters of Prince George's County to remove Judge Turner from office. This argument is circular, and depends wholly on the validity

- 47 -

of Appellant's position concerning Judge Turner's eligibility for judicial office.

Under the circumstances of this case, at a minimum, the unreasonable delay in Appellant's filing of the petition prejudiced Judge Turner and the State Board of Elections. The untimely filing of the petition obviously prejudiced Judge Turner, who relied on the certification of her candidacy and the certification of the general election results, "only to have the results belatedly challenged on a ground that was ripe prior to Election Day." Ross, 387 Md. at 672, 876 A.2d at 706. The State Board of Elections "likewise was prejudiced because it too relied on the correctness of the ballots and expended considerable efforts in overseeing the election when [Judge Turner]'s candidacy could have been protested judicially prior to the election[.]" Id. at 672-73, 876 A.2d at 706.

And, as in Liddy, Appellant's unreasonable delay in filing the petition in the circuit court may have resulted in prejudice to the voters of Prince George's County. See Liddy, 398 Md. at 254-55, 919 A.2d at 1290 ("The confusion that would have resulted from [] last-minute changes [to the election] would have, indubitably, interfered with the rights of Maryland voters, particularly those who had already cast absentee ballots, causing them to be disenfranchised and the value of their votes diluted[,] as they would not be able to vote again."). Ultimately, as in Ross, 387 Md. at 673, 876 A.2d at 706, we conclude that, because Appellant's "delay would result in [Appellee]s and the people of [Prince George's County] being placed in a less favorable position due to their justifiable reliance on the circumstances in existence on Election Day, [Appellant]'s actions [are] sufficiently prejudicial so as to warrant the application of [the doctrine of] laches." For all of these reasons, the circuit court was correct in concluding that the election claims are barred by

the doctrine of laches.

In sum, we hold that the circuit court correctly granted the motion to dismiss on the grounds that the election claims were untimely under EL § 12-202(b), the statute of limitations, and barred by the doctrine of laches. We conclude that Appellant's petition was untimely filed under EL § 12-202(b) because Appellant did not file the petition in the circuit court until May 9, 2017, more than six months after the 2016 general election, and more than one year after Appellant admittedly became aware of the facts that served as the basis for the election claims; and the petition was filed at least several months after the election results were certified. We discern no basis on which to toll the statute of limitations. Additionally, we determine that, apart from EL § 12-202(b)'s statutory limitations period, the petition is barred by the doctrine of laches because, in filing the petition in the circuit court more than six months after the 2016 general election, Appellant engaged in unreasonable delay, and that delay resulted in prejudice to Appellees. Accordingly, we affirm the judgment of the circuit court.[15]

> **JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. APPELLANT TO PAY COSTS.**

---

[15]Because we conclude that the circuit court correctly granted the motion to dismiss based on the statute of limitations and the doctrine of laches, we need not—and do not—address the merits of the election claims as presented in the other three issues raised on brief by Appellant. Indeed, to do so would simply be an academic exercise. To be sure, the merits of the election claims raise interesting issues; however, any discussion of the merits of the case by this Court, in light of the untimeliness of the filing of the petition, would be *dicta*. Rather, under the circumstances of this case, we cabin our consideration to the issues that are dispositive of the case—namely, application of EL § 12-202(b)'s statutory limitations period and the doctrine of laches.